In re Assessment of Taxes, 21 Haw. 352.

# IN RE ASSESSMENT OF TAXES WAILUKU SUGAR COMPANY.

APPEAL FROM TAX APPEAL COURT SECOND JUDICIAL CIRCUIT.

ARGUED OCTOBER 30, 1912.          DECIDED NOVEMBER 15, 1912.

# IN RE ASSESSMENT OF TAXES PAAUHAU SUGAR PLANTATION COMPANY.

APPEAL FROM TAX APPEAL COURT FOURTH JUDICIAL CIRCUIT.

ARGUED OCTOBER 10, 1912.          DECIDED NOVEMBER 15, 1912.

ROBERTSON, C.J., PERRY AND DE BOLT, JJ.

TAXATION—*valuation of enterprise for profit—past history and future prospects and possibilities.*

When a sugar-producing plantation has recently undergone extensive development through the acquisition or use of additional lands or water supply, it would be unsafe in determining the value of the aggregate property of the corporation for taxation purposes to place entire reliance upon the profits and dividends received from the three crops harvested since the extension, largely from virgin soil and at a time when prices of sugar were unusually high. Reasonable allowance must be made, as an intending investor would make, for a possible decrease of profits and dividends for the future due to possible reduction in the yield of cane and in the prices of sugar and increase in the cost of production.

In valuing the property of such a corporation as an enterprise as a whole intending purchasers consider chiefly the earning power of the property in the long run as shown by its past history and future prospects and possibilities. The main consideration is the future, the past being of importance chiefly in determining what the future is likely to be. The conservative, not the speculative, spirit should control in matters of assessments.

ID.—*no one rule applicable in all cases.*

In making such valuations no one rule can be justly followed in all cases, so varying are the factors that go to determine the values in different cases. The statute requires that in each case there shall be "taken into consideration" besides certain matters specially enumerated, "all other facts and considerations which reasonably and fairly bear upon such valuation."

In re Assessment of Taxes, 21 Haw. 352.

ID.—*valuation of Wailuku Sugar Company's plantation.*

Upon the evidence a valuation of $3,600,000 is placed on the property of the Wailuku Sugar Company's sugar plantation for taxation purposes for the year 1912.

ID.—*valuation of Paauhau Sugar Company's plantation.*

A valuation of $1,500,000 for the year 1912 placed on the sugar plantation of the Paauhau Sugar Plantation Company by the tax appeal court is sustained and the appeal of the Territory is dismissed.

OPINION OF THE COURT BY PERRY, J.
(ROBERTSON, C.J., DISSENTING IN WAILUKU SUGAR COMPANY
CASE).

These are appeals from decisions of tax appeal courts fixing the valuations of the property of the two corporations named as "enterprises for profit" for taxation purposes as of January 1, 1912.  In the case of the Wailuku Sugar Company the property was returned at $3,250,000 and assessed at $4,250,000. The taxpayer thereupon accepted a valuation of $3,500,000 appealing as to the excess and the tax appeal court fixed a valuation of $4,250,000.  The taxpayer expresses in this court, as it did in the tax appeal court, a willingness to accept a valuation of $3,600,000.  The Paauhau Sugar Plantation Company returned its property at $1,400,000, the amount assessed was $1,600,000 and the valuation by the tax appeal court was $1,-500,000.  The present appeals are by the taxpayer in the first case and by the Territory in the second.

The statute authorizing assessment of "enterprises for profit" has been carefully considered and the principles applicable in cases of this nature have been clearly defined in former opinions of this court.  No further discussion of these principles is necessary.  We adhere to them.  A few quotations will suffice. "The distinguishing feature of the Act * * * is that it requires several kinds or parcels of property when combined as the basis of an enterprise for profit to be assessed as a whole, whereas previously the several parts of such property had been assessed separately."  *In re Tax Assessment Appeals,* 11 Haw. 235.  "The tax

in question is not an income tax, depending for its amount upon the income for the year preceding, but a tax on property the earning power of which is one of the most potent factors in determining its value.   Nor is any single or arbitrary rule prescribed in the statute for estimating the value of the property. Not only could no rule be justly followed in all cases, so varying are the factors that go to determine the values in the different cases, but the statute itself provides that 'there shall be taken into consideration,' besides the matters specially enumerated 'all other facts and considerations which reasonably and fairly bear upon such valuation.'   The question is, what is the fair and reasonable value of the property as a whole, *all* things considered; not, what is the arbitrary amount (which could scarcely be called value) that would be obtained by considering only certain things."   Ib. 238.   "In valuing the property as an enterprise as a whole, intending purchasers consider chiefly the earning power of the property in the long run as shown by its past history and future prospects and possibilities.   The main consideration is the future; the past being of importance chiefly as a help in determining what the future is likely to be."   Ib. 237.   "An important question in considering the past of a plantation is whether it has been a growing or a declining plantation, as, for example, through changes in its water supply or the extent of its area of cultivation or in other respects,—this, of course, in so far as such changes tend to indicate what the future will be.   In some districts for instance the rainfall, perhaps the only or principal source of the water supply, has been gradually diminishing, while in other cases, the supply, whether from rain, streams or wells, seems assured indefinitely.   In some cases, a plantation may have apparently just taken a fresh start, or entered upon a new lease of life, as it were, through the acquisition of additional lands or water supply or a change in its variety of cane or a more extensive use of fertilizers, or for some other reason.   In such a case the net profits of the past would not be of the same weight as they would be in other

In re Assessment of Taxes, 21 Haw. 352.

cases. And yet the prospects for the future in such a case should not alone be considered or the value be placed at once at the full amount which such prospects or anticipations may seem to some to justify, for experience may prove them to be largely illusory. The conservative, not the speculative, spirit should control in matters of assessment." Ib. 239. "The cash value of property at a given time is determined by what people then believe it to be worth, not by what it may turn out afterwards to have been worth. Consequently future prospects but not subsequent events may be considered." Ib. 241. "A very important point of difference between plantations is found in the character of their landed estates. A plantation which owns its land in fee simple is worth more than one which has only a leasehold interest. Some leases are long, others short. Generally only a portion of the land is held under lease, the proportion varying greatly. Often there are many leases expiring at different times. The probability of being able to renew the leases at fair rates or to purchase the land varies greatly." Ib. 241. "In some cases the plantation could continue well without the leased land, in other cases the land from its location or extent or for other reasons would be almost indispensable. Thus there are many circumstances to be considered." Ib. 241. "Just as the effect of many factors that go to determine the value of the property is shown largely by the net profits, so the effect of all the factors is shown largely by the actual sales of stock, for this shows what persons who actually invest consider the property to be worth. And yet here also distinctions must be made. Small blocks would generally sell at higher prices than large blocks. A large number of sales would be a surer test than a small number. It makes a difference also whether the purchasers are persons competent to judge or not. Allowances must also be made for high prices paid for special reasons, such as to obtain control, or because of sentiment, etc." Ib. 244. "Sugar plantation property may be worth its definitely ascertained salable or purchasable value or its value as shown by

profits obtained or obtainable, depending upon skill or judgment as well as expenditure of money, the result being contingent upon variable factors of cost of production and market prices. It would be entirely unsafe to test values of corporation property solely by sales of shares of its stock or by prices offered without regard to the number of shares sold or bid for or whether they are bought for investment or speculative purposes. No hard and fast rules of testing values can be made to apply in all cases and yet practical common sense and a desire to assess at their fair value furnish an excellent guide." *Tax Assessor* v. *Wailuku Sugar Co.,* 18 Haw. 423.

With reference to the Wailuku Sugar Company the facts are as follows: On January 1, 1912, it had under cultivation 4439 acres owned in fee simple and 310 acres held under lease and in addition owned 145 acres of cane land not under cultivation, 130 acres of taro land, 20 acres of rice land, 2331 acres returned as pasture land, 5188 acres as forest land and 3830 acres as mountain land. The corporation owns all of the water used to irrigate the plantation. Always as an enterprise for profit, the aggregate property was assessed in 1906 at $1,700,000, in 1907 and 1908 at $2,000,000, in 1909 at $2,400,000, in 1910 and 1911 at $3,250,000. The sugar produced for the six years last past was: 1906, 7828 tons; 1907, 7426 tons, 1908, 10,072 tons; 1909, 17,761 tons; 1910, 16,942 tons and 1911, 16,198 tons; and the estimated crop for 1912 is 17,000 tons. Crops of from 16,000 to 17,000 tons may reasonably be expected for the immediate future. For the same six years the yield per acre and the profits have been as follows: 1906, 5.98 tons and $130,-739.15; 1907, 5.76 tons and $93,203.27; 1908, 7.57 tons and $281,097; 1909, 7.71 tons and $546,697.78; 1910, 7.15 tons and $601,968.03; and 1911, 7.11 tons and $459,809.96. Twenty-five shares of the capital stock of the corporation changed hands in March, 1911, at $165 a share. There was no evidence of any other sale of stock in 1911. The chief justice at the hearing in this court stated that in June, 1911, he sold twenty

shares at $172.50. The capital stock is $3,000,000 divided into 30,000 shares of $100 each. The average profits for the three years last past, that is, since the plantation's enlargement was completed, were $536,158.39 and the average dividends for the same period $517,500. Save as to such inference, if any, as may be drawn from the fact of its ownership of 2331 acres of "pasture land," no evidence was adduced as to whether the plantation is capable of further territorial expansion and, if so, what the cost of such expansion would be.

We think that the valuation of $3,600,000 conceded by the taxpayer is sufficiently high and place the valuation of the property in question at that sum. The average net profits, $536,-158.29, and the average dividends, $517,500, received for the three years last past would, perhaps, justify at the rate of capitalization, 12½ per cent., claimed by the Territory a higher assessment if they had been earned and paid through a longer period of years and under circumstances productive of greater certainty that the plantation would with respect to profits and dividends do as well in the future as it had done in the recent past. It requires no evidence to show that it was apprehended in this community prior to January 1, 1912, as it is now, that uncertainty exists as to whether the present tariff on sugar imported into the United States will be maintained and to what extent it will be decreased. It is equally true that on the assessment date there was, to put it mildly, a real uncertainty as to whether the unusually high prices of sugar then prevailing and which had prevailed for a few years would, considering solely the laws of supply and demand, be long maintained. So, too, the crops for 1909, 1910 and 1911 were largely grown on virgin soil just added to the planted area of the plantation. The price of labor, it is well known, has risen considerably in the recent past and will in all probability continue for some time to rise; and other items that enter into the cost of production are increasing in cost. To these considerations it is an insufficient answer to say that when the reduction in price or in the increase

in cost of production shall come the assessments may be re-
duced.    An intending investor considers all of these possibili-
ties and probabilities *before* making the purchase and makes
allowance for them in determining upon the price to be paid by
him.    It would be unsafe to place entire reliance upon the good
showing of the three years now last past, just as it was in the
opinion of the tax assessor as testified to by him unsafe in Jan-
uary, 1911, to place entire reliance upon the results of the two
crops which had at that time been harvested from the planta-
tion as enlarged.    To prevent misunderstanding it may be added
that the lesser annual profits and dividends for the years prior
to 1909 cannot be permitted to operate in favor of a reduced
assessment since the value to be sought is that of the plantation
as enlarged and not that of the plantation as it existed prior to
1909.    Reasonable allowance must be made, as an intending
investor would make, for a possible decrease of profits and divi-
dends for the future.    A valuation of $3,600,000 at the rate of
capitalization claimed by the Territory, 12½ per cent., would
require for its justification average annual profits of $450,000.
With average annual profits for the three years last past of
$536,158.29, a reduction of 269/1000 of one cent per pound
in the price of sugar would suffice, assuming that in all other
respects the excellent showing of the plantation would be main-
tained, to cause in a crop of 16,000 tons, a reduction of $86,-
158.29 in the annual profits and under the same circumstances
a reduction of 253/1000 of one cent per pound would cause the
same reduction in the profits in a crop of 17,000 tons.    It is
worthy of mention in this connection that in 1911, with the
benefit of high prices, some new land and an excellent yield
per acre the profits were only $459,809.96 as against $601,-
968.03 in the preceding year.    "The main consideration is the
future, the past being of importance chiefly as a help in de-
termining what the future is likely to be;" and "the conserva-
tive, not the speculative, spirit should control in matters of as-
sessment."    *In re Tax Assessment Appeals,* supra.

In re Assessment of Taxes, 21 Haw. 352.

The sales of twenty-five shares of stock at $165 and of twenty shares at $172.50 (assuming, but not deciding, that the latter may be considered as though it had been testified to at the trial) are worthy of but little, if any, weight in determining the value of a plantation whose capital stock is divided into 30,000 shares. So, also, we shall not attempt to arrive at the desired valuation by making comparisons with assessments judicially fixed for former years since that course would involve a study of all the circumstances bearing upon the former valuations as they existed at the assessment dates and the record before us does not purport to show all of those circumstances.

The Paauhau Sugar Plantation Company has a capital stock of $5,000,000 divided into 100,000 shares of the par value of $50 each. It has under its control about 50 acres of forest land and about 4800 acres under cultivation. It owns in fee the forest land and 985 acres of the cane land and holds under lease about 3900 acres. Of the latter about 1150 acres, being the land of Kalopa and extending throughout the center of the plantation from the sea to the forest, is owned by the Territory of Hawaii, the leases as to 1005 acres expiring in 1913 and as to the remainder in 1916. Owing to the present homesteading policy of the Territory it is practically certain that the use of the land by the corporation cannot be continued after the expiration of the present leases. Whether the homesteaders taking up the land will plant it to cane and sell their crops to the sugar corporation is, of course, entirely problematical. As to 450 acres of additional land the leases, all expiring within six years, are from individuals and can probably be renewed, although at increased rentals. The remainder of the leased land is owned in fee by three subsidiary corporations under the absolute control of the Paauhau Company.

The cane lands are irrigated in part. For the crop of 1912 it was the intention in January of that year to irrigate 1299 acres and leave 1333 acres unirrigated. The corporation is under a contract with a water company to take 20,000,000 gal-

lons of water daily at a price of $70,000 per annum, but has disposed of sufficient water to others to reduce the cost of the remainder to $45,000 per annum. Owing to an abundant rainfall the remaining water has been for much of the time during the year the contract has been in operation not needed by the plantation and has run to waste into the sea.

The crops produced by the plantation for a few years last past with the cost of production per ton, profits earned and dividends paid have been as follows:

|  | Crops | Cost | Profits | Dividends |
|---|---|---|---|---|
| 1905 | 8,006 tons | $37.08 | $......... | $....... |
| 1906 | 8,795 tons | 43.81 | 139,632.76 | 195,000 |
| 1907 | 7,857 tons | 42.12 | 166,034.00 | 180,000 |
| 1908 | 10,448 tons | 36.26 | 370,792.10 | 190,000 |
| 1909 | 9,315 tons | 42.11 | 245,784.50 | 240,000 |
| 1910 | 7,493 tons | 54.88 | 127,195.01 | 220,000 |
| 1911 | 8,411 tons | 52.76 | 117,708.06 | ....... |
| 1912 | 10,500 tons | estimated | | |

Of the 10,500 tons estimated for 1912, 900 tons are expected to be furnished by homesteaders. The average annual profits for the six years were $194,524.40 and the average annual dividends $170,833.33. The three subsidiary corporations receive from the Paauhau Company total annual rents of $9500, own no property other than that leased to the Paauhau Company and the total of their accepted assessments for January 1, 1912, is about $133,000. For 1912 and succeeding years larger and more uniform crops would seem to be assured because of the increased supply of water for irrigation, but, on the other hand, the cost of labor and materials has increased in recent years and will probably continue to increase in the future. What has been said above with reference to the uncertainty of the tariff and of the prices of sugar applies to this case as well.

In 1911 one of the witnesses who testified before the tax appeal court purchased 100 shares of the capital stock of this company at $16 and sold the same at $21. C. Brewer & Company,

the Honolulu agents of the corporation, purchased 2750 shares at $24.34 per share, it being claimed by Brewer & Company that the purchase was made in deference to the view of some of the stockholders of the Paauhau Company that the agents should own stock in the Sugar Company and thus increase their interest in its welfare. The agency contract was worth to the agents from $10,000 to $12,000 per annum. In all about 8000 shares of stock of Paauhau Company were sold in 1911 at prices ranging from $16 to $25.50 per share. The Paauhau Company's property was assessed in 1905 and 1906 at $1,400,000, in 1907 and 1908 at $1,300,000, in 1909 and 1910 at $1,500,000, and in 1911 at $1,400,000.

In this as in the preceding case, without enumerating all of the circumstances disclosed by the evidence that bear upon the value of the plantation and which have been taken into consideration by us, we think that the valuation fixed by the tax appeal court, $1,500,000, should not be increased and affirm the valuation appealed from. Whether that valuation is too high it is unnecessary to consider. The taxpayer has not appealed.

Much reliance is placed by the assessor upon the fact of the sales of stock in 1911 at prices as high as $25 per share. But while this element is of greater importance in this case than in that of the Wailuku Sugar Company, it is not such as to overcome the force of the figures relating to the net profits and the dividends, the practically certain loss in the near future of the 1150 acres of government lands now under cultivation, the prospects for the immediate future as to production and its cost, the uncertainties already referred to and the other circumstances of the case.

The annual exhibit for December 31, 1911, filed by the corporation with the treasurer of the Territory as required by law, shows a valuation of its assets of over $5,000,000. It is conceded, however, by counsel for the Territory that the values stated in the exhibit are unduly inflated,—for the purpose, possibly, of favorably affecting sales of stock. Whatever may have

been their purpose, we attach no weight to the valuations there set forth. This is not a proceeding to punish the corporation for making an exhibit insufficiently founded on fact but merely to ascertain as nearly as may be possible the true value of the property of the corporation as an enterprise for profit as of January 1, 1912.

*A. G. Smith,* Deputy Attorney General (*Alexander Lindsay, Jr.,* Attorney General, with him on the brief), and *A. A. Wilder* (*Thompson, Wilder, Watson & Lymer* on the brief) for the Assessor.

*M. F. Prosser* (*Kinney, Prosser, Anderson & Marx* on the brief) for Wailuku Sugar Company, and *W. L. Stanley* (*Holmes, Stanley & Olson* and *Smith, Warren & Hemenway* on the brief) for Paauhau Sugar Plantation Company.

OPINION OF ROBERTSON, C.J., DISSENTING IN THE CASE OF WAILUKU SUGAR COMPANY.

I agree that the valuation of the Paauhau plantation should remain, as fixed by the tax appeal court, at $1,500,000, but I think that $3,600,000 is too low a valuation for Wailuku plantation, and it is altogether out of proportion to the Paauhau assessment.

In deciding the cases reported in 11 Haw. 235 *et seq.* this court went very carefully into the consideration of the matter of assessing enterprises for profit, particularly sugar plantations, and laid down certain rules to be followed in valuing sugar properties which I believe have ever since been followed and which ought not to be departed from now. Applying those rules to the evidence in this case and giving the appellant the full benefit of every legitimate allowance I do not see how its property can be valued at less than $4,000,000.

In *Inter-Island Steam Nav. Co.* v. *Shaw,* 10 Haw. 624, 639, it was held that while the earnings and the market value of the stock of a corporation should not be taken as the sole test in the valuation of its property, yet those are very important matters

to be considered, and they furnish in most cases the best *datum* to start from. And in 11 Haw. 244, it was said that "Just as the effect of many factors that go to determine the value of the property is shown largely by the net profits, so the effect of all the factors is shown largely by the actual sales of stock for this shows what persons who · actually invest consider the property to be worth."

The two sales of stock referred to, one at $165 and another at $172.50, were of small blocks and it is not to be supposed that the entire capital stock of the corporation could have been sold at those rates. Three hundred thousand shares at the first named rate would show a total valuation of $4,950,000 and at the latter rate, $5,175,000. Assuming that the second sale should not be taken into consideration, it would be fair and the appellant should not complain, if from the valuation of $4,950,-000 a discount of fifteen per cent. should be allowed. That would show a total net valuation of $4,207,500. As a matter of fact actual sales of stock need not be shown. The statute requires that when the stock of a corporation is quoted on the market the market price thereof is to be taken into consideration in assessing the company's property. The stock of a company may seldom be dealt in but that fact does not necessarily show that the company is not a prosperous one. Frequently it indicates the opposite. Evidence of *bona fide* sales is valuable as showing what investors are ready to pay and have paid for the stock.

The net profits of a corporation show its earning power, and consideration must always be given to the amount of dividends, if any, which in past years have been paid to the stockholders. In the case of a sugar company the element of good-will does not figure and the amount of its profits have a direct relation to the intrinsic value of its property. But where a plantation has been developed, rehabilitated and put upon a new footing, its earning power as newly established is the important consideration. For this reason the profits of Wailuku plantation prior

to the year 1909 should not be taken into the calculation. This phase of the subject was dealt with in 11 Haw. 239 as follows: "In some cases, a plantation may have apparently just taken a fresh start or entered upon a new lease of life, as it were, through the acquisition of additional lands or water supply or a change in its variety of cane or a more extensive use of fertilizers, or for some other reason. In such a case the net profits of the past would not be of the same weight as they would be in other cases." This plantation was valued on January 1st, 1907 at $2,000,000 with an intimation that it might well have been re-garded as being worth more than that sum. *In re Assessment of Wailuku Sugar Co.,* 18 Haw. 422. Since then the company has doubled its output and its capital stock, and trebled its prof-its, and its stock has been sold upon the market at more than sixty per cent. above par. In view of these circumstances it would be rather strange if the property was not worth double what it was at that date. The future outlook was no darker on January 1, 1912, than on January 1, 1907. This plantation's yield in 1906 was 7828 tons, and in 1907, 7426 tons, and its yield per acre during those years was less than six tons. Since then it has "entered upon a new lease of life." In 1910 the company doubled its capital stock, its plantation is in a position to put out between 16,000 and 17,000 tons of sugar annually, and since 1908 its average yield per acre has exceeded seven tons. It owns a large area of land in fee, but a small fraction of its cane land being held under lease. It is an irrigated plan-tation and has its own water supply. The plantation is well situated, in good physical condition, and has good prospects of maintaining its output, the estimated yield for 1912 being 17,-000 tons. Considered on the basis of capitalization of profits such a plantation, according to the rule laid down in 11 Haw. 244, should be subjected to a rate of 12 or 12½ per cent. The court there said, "It seems to us that a sugar plantation under favorable conditions, as, for example, one that owns its land in fee, has for a period of years paid say, 12 or 12½ per cent and

In re Assessment of Taxes, 21 Haw. 352.

has besides been maintained in a state of efficiency and has every prospect for doing as well in the future as it has done in the past, would generally be considered to be worth par." And in fixing the values of the plantations which were then under consideration special reference was made to the amount of dividends paid to the stockholders during a number of years. What the court there said as to a plantation's "prospect for doing as well in the future as it has done in the past" is to be understood as applying to the condition and situation of the plantation, and, not as counsel for the appellant would have it, as referring to the effect of possible unfavorable legislation. There were broad uncertainties depending on national action existing at the time those cases were decided and they were adverted to in another part of the opinion of the court. The condition of the cane sugar industry in these islands is no less stable now than it was in 1897 when the cases referred to were decided. It is generally acknowledged that all business and industry in this Territory was put upon a sounder basis when these islands were annexed by the United States. In 1897, as now, there seemed to be considerable uncertainty as to what the future would bring forth. Uncertainty has prevailed ever since it was conceived that protection is essential to the profitable prosecution of the sugar industry and the feeling becomes acute whenever agitation is made for the removal or reduction of the tariff on raw sugar. This uncertainty affects to some extent nearly all values in this Territory, but especially those of sugar properties. On January 1st, 1912, as it is now, it was impossible to predict what, if any, change might be made in the sugar tariff. As to market prices, the prospects at that time were that fair prices would be obtained for the 1912 crop. The market price of sugar fluctuates considerably and sometimes unexpected events cause sudden changes in the world's market. Yet comparatively small fluctuations in the world's price may make the difference between a profit and a loss to a Hawaiian sugar plantation. It is because of these uncertainties that this court has recog-

nized the fact that it would be unfair to base the value of a sugar plantation upon a consideration of the profits of a single profitable year, or to assume that large profits are assured for the future because they have been realized for several years past. And it is because of this that in basing an estimate of value upon the capitalization of past profits very liberal rates are authorized. If Wailuku's last year's dividend of $540,000 was assured indefinitely it would be absurd, of course, to think of assessing the property at only four million dollars. What effect upon the intrinsic value of sugar properties threatened tariff legislation will have cannot be calculated until the legislation has been accomplished and its nature ascertained. In the mean time at least the carefully considered rules laid down by this court in 1897 should be adhered to.

It is true, as held in 11 Haw. 237, that assessments should not be changed from year to year for light reasons, but under our system of taxation property is valued each year and assessments may be and should be increased or decreased to meet changes in conditions which materially affect values. If, as it is contended it will happen, the cost of production of sugar will continue to increase, market prices decline, and profits shrink good reason will doubtless be furnished for reducing the assessments on sugar properties in future years.

The average annual yield of the Wailuku plantation for the past three years was 16,964 tons, and the estimated yield for the present year was placed by the manager at 17,000 tons. Its net profits for the last three years averaged $536,158. The dividends paid to its stockholders during the three years averaged annually the sum of $517,500. The capitalization of those dividends according to the rule heretofore held applicable to a plantation such as this, i. e. at the rate of 12½ per cent., will show a value of $4,140,000.

A comparison of Wailuku plantation with Paauhau plantation and the valuation fixed upon the latter shows that an assessment of the former at $4,000,000 would be very fair to the

company. Paauhau paid no dividend in 1911 but it made a net profit of $117,708 in that year. Regarding that sum as available for dividends during that year and adding it to the dividends paid during the five years next preceding it would show an average annual dividend over a period of six years of $190,451, which capitalized at the rate of 12½ per cent. would show a valuation of $1,523,608. Its assessment has been fixed at $1,500,000. In the Paauhau case the evidence of sales of stock is entitled to little or no weight. The purchase made by C. Brewer & Company was for a special reason, and the company's corporation exhibit which, to put it very mildly, was highly inflated and misleading may have deceived purchasers and paved the way to stock juggling. To assess Wailuku plantation at $3,600,000 is, upon the capitalization of profits basis, at the rate of about 14 1/3 per cent. But Wailuku plantation is in situation, condition and stability far superior to Paauhau and its future prospects are much brighter. To assess Paauhau at $1,500,000 and Wailuku at $3,600,000 is to do a gross injustice either to Paauhau in its case or to the government in the Wailuku case, or, possibly, to one and the other in each case. It is true that as the Paauhau company did not appeal from the valuation fixed by the tax appeal court this court cannot reduce the assessment. But the Paauhau company returned its property at $1,400,000, and even if it should be conceded that that company is over assessed at $1,- 500,000 it would not prove that Wailuku would be over valued at the sum of $4,000,000. There is nothing in the record that will warrant the inference that the property could have been purchased on the first of January last at less than that figure, or at the rate of $133.33 per share of stock. The statute provides that property shall be assessed at its full cash value. Discrimination between different taxpayers, unless based on real differences in circumstances, is even more objectionable than general excessive taxation. 11 Haw. 242. In the cases at bar the more stable plantation is assessed upon a basis more favor-

able to the company than that applied to the less fortunate concern. It seems to me that the majority opinion, while purporting to follow the principles laid down in the cases in 11 Haw., in effect repudiates some of them, and tends to set adrift the whole subject of sugar plantation assessment. No new rules are enunciated which might serve as future guides to tax assessors and taxpayers in place of those which have been set aside.